Filed 8/7/13  In re J.V. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.V., a Person Coming Under the Juvenile Court Law. | B247062 (Los Angeles County Super. Ct. No. CK86485) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. L.L., Defendant and Appellant. | |

APPEAL from order of the Superior Court of the County of Los Angeles, Philip Soto, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli County Counsel, James M. Owens, Assistant County Counsel, Stephen D. Watson, Senior Associate County Counsel for Plaintiff and Respondent.

## INTRODUCTION

L.L. (mother) appeals from the dependency court's order made at a six-month review hearing under Welfare and Institutions Code section 366.21, subdivision (e)[1] denying her request that her 13-year-old son, J.V., a dependent of the juvenile court, be returned to her custody. Mother contends substantial evidence does not support the finding that returning J.V. to her custody created a substantial risk of detriment to the child. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Previous Appeal[2]

On February 9, 2011, the Department of Children and Family Services (DCFS) filed a petition under section 300 alleging, inter alia, that father and mother had subjected J.V. to emotional abuse due to an ongoing custody dispute between the two. That same day, the juvenile court found a prima facie case, detained J.V., and released him to mother. The juvenile court ordered no visitation for father, but gave DCFS the discretion to liberalize that order to monitored visitation in a therapeutic setting. The juvenile court also ordered an Evidence Code section 730 evaluation of father, mother, and the minor.

On April 5, 2011, the juvenile court sustained the allegation in paragraph c-1 of the petition alleging that father and mother had emotionally abused the minor. The juvenile court declared J.V. minor a dependent of the court, removed him from father's custody, released him to mother, ordered family maintenance services, individual counseling, and conjoint counseling with J.V. for mother. The juvenile court also ordered individual counseling for J.V.

---

[1]    All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]    The facts concerning the previous appeal in this case are based in large part on the facts set forth in our earlier unpublished opinion in that appeal—*In re J.V.* (February 25, 2013, B242145 [nonpub.opn.]).

On or about October 3, 2011, Dr. Sandra Hah, a psychiatrist, submitted to the juvenile court her Evidence Code section 730 evaluations of J.V. and his parents. Dr. Hah provided the following diagnoses and recommended treatments: "1. As to [J.V.], the data is consistent with a diagnosis of Anxiety Not Otherwise Specified and Mood Disorder Not Otherwise Specified. He clearly suffers from anxiety and mood dysregulation related to parental conflict and the uncertainty of custody arrangements. Additionally, a diagnosis of Post Traumatic Stress Disorder is a possibility. [¶] 2. As to the mother, the data is consistent with a diagnosis of Generalized Anxiety Disorder and Post Traumatic Stress Disorder, although allegations of domestic violence have not been verified. [Mother] minimized some of the symptoms so she did not meet full criteria for a diagnosis of Major Depressive Disorder but it is a possibility. [¶] . . . [¶] 4. [J.V.] would benefit from either individual psychotherapy, play therapy, cognitive behavioral therapy, or a combination of all three. If his anxiety or mood symptoms worsen, he may benefit from antidepressant medications such as selective serotonin reuptake inhibitors (SSRI's). Additionally, [J.V.] should continue to have regular social activities with peers and access to positive role models and mentors, both male and female. Finally, it would be helpful for the minor to be in family counseling with his mother and/or father to facilitate working through situations of intense conflict and to help establish healthy boundaries between mother and minor, and father and minor. [¶] 5. The mother . . . would benefit from individual psychotherapy and more regular attendance at her current domestic violence support group. Additionally, it may help her feel more empowered as a single parent to take parenting classes, particularly ones that are more focused toward setting personal boundaries with children and decreasing enmeshment. [Mother] should continue to seek peer friendship and support (as she has found in church groups), and minimize isolation of herself and her son. Finally, it is recommended that [mother] attend co-parenting therapy with the father, [J.V.], to address issues of extreme hostility and conflict, so they can positively and cooperatively rear their child, [J.V.]. . . ."

On March 29, 2012, DCFS filed a section 387[3] petition alleging that the "previous disposition had not been effective in the protection or rehabilitation of [J.V.]." Specifically, DCFS stated the following in paragraphs s-1 and s-2 of the petition: "s-1. [J.V.'s] mother . . . created a detrimental home environment for [J.V.] by emotionally abusing [him]. Such emotional abuse consisted of, but is not limited to, the continued custody issues, visitations for [J.V.'s] father and the continuing disparagement of the father and other maternal relatives to the minor, to the extent that [J.V.] has been emotionally isolated from the father and other relatives. Such conduct on the part of [J.V.'s] mother . . . places [J.V.] at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression and withdrawal that [J.V.] displays. [¶] s-2. On numerous occasions, [J.V.'s] mother . . . has displayed mental and emotional problems including, Post Traumatic Stress Disorder. Further, on prior occasions [J.V.'s] mother . . . has not provided continuous Mental Health services for herself or her son. Due to the mother's limitations, the mother is unable to provide regular mental health care for her son. Such mental and emotional condition on the part of the mother endangers [J.V.'s] physical and emotional health and safety and places [J.V.] at risk of future physical and emotional harm and damage."

DCFS filed a March 29, 2012, detention report, reporting that a Children's Social Worker (CSW) explained the reasons for the section 387 petition as follows: "This family came to the attention of DCFS on 11/17/2010 when a referral alleged the [J.V.] was placed on a [section 5585] hold. [J.V.] was hospitalized on a [section 5585] hold on

---

[3]     Section 387, subdivisions (a) and (b) provides: "(a) An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition. [¶] (b) The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3."

4

11/17/2010, for reporting not wanting to visit father and would kill himself or father and was diagnosed with major depression. Prior to discharge, [J.V.] was taken from the hospital/Alhambra BHC by mother against medical advice on 11/21/2010. The family has had 17 prior investigations with the department and a Voluntary Family Maintenance Case with the department. All of the family's prior referrals with DCFS . . . relate [to] the parents conflict with one another. Mother and father have been divorced for the past 10 years. During this time the parents have been in battle with one another utilizing the Family Law Court System which has been detrimental to [J.V.'s] well being. [¶] Mother has continued to be resistant to mental health services both for herself and her son. [J.V.] has met with Department of Mental Health [(DMH)] staff Ms. Keyondria Bunch PhD., yet only in the presence of . . . mother. [J.V.] continues to report that he is scared of . . . father and that father will hurt him. Numerous attempts have been made to link [J.V.] and mother with services. Previously, mother has stated that she does not wish to receive services through DMH, instead she previously wanted to take [J.V.] for treatment at Glen Roberts Child Study Center where she reported to have been denied in November due to insufficient medical coverage. CSW and DMH have also tried to refer mother to full Service Partnership yet mother refuses in home services. Department of Mental Health continues to express concern for [J.V.] with strong recommendation that mother and [J.V.] follow through with mental health assessment and treatment. Measures are to be taken to ensure this follow through with continued Department of Children and Family Services to ensure that [J.V.] is in a stable, consistent, and supportive environment that will support and facilitate continued mental health treatment, attendance in school, and appropriate choice in [J.V.'s] daily functioning. Family Law Court appointed [J.V.'s] attorney Sandra Etue reported ongoing child alienation issues on behalf of mother and [J.V.] reporting to her on many occasions to be fine with visiting with father and reporting understanding that mother does not want [J.V.] to visit with father or any other member of her own family. Mother has alienated herself and [J.V.] from all maternal family members for perceived slights and alienation with the father. Mother's alienation of these family members has eliminated valuable family support to [J.V.], who previously

5

ha[d] good existing relationships with [his] [maternal grandfather] and uncle. Mother's continued anxiety and paranoia has caused [J.V.] undue stress, confusion and symptoms of depression. This has caused vicarious traumatization to [J.V.] and places him at risk for several mental health distortions and cognitions requiring intensive mental health intervention. As to the Family Law Court minute order dated 02/01/2011, Family Law Court found that it is not in [J.V.'s] best interest to exclude father from [J.V.'s] life."

At the March 29, 2012, detention hearing, the juvenile court found that DCFS had made a prima facie case for detaining J.V. and showing that a substantial danger existed to the physical and emotional health of the minor. The juvenile court further found that there were no reasonable means to protect J.V. without removal from mother's home, that reasonable efforts had been made to prevent or eliminate the need for such removal, and that continuance in mother's home was contrary to J.V.'s welfare. The juvenile court detained J.V., removed him from mother's custody, and ordered him placed with any suitable relative. The juvenile court also ordered monitored visitation for mother and father with a DCFS approved monitor.

In the May 18, 2012, jurisdiction/disposition report, a CSW reported that she interviewed mother who told her the following: "Mother stated that she does not isolate [J.V.]. Mother stated that she refuses to allow father to have contact with [J.V.] due to his past actions and behaviors. Mother stated that she believes that her relatives are on father's side and therefore has refused to allow them to have contact. Mother stated that she had only allowed her brother [J.L.] minimal contact. [¶] Mother stated that she did acquire mental health services for [J.V.], but had difficulties due to confusion about insurance and her inability to continue to pay for services on her own. Mother states that she does not have any mental health issues that she needs to address."

The CSW also interviewed father and provided the following: "Father stated that mother has progressively increased [J.V.'s] isolation from father and the entire family since [J.V.'s] birth. Father states that he believes that mother has increased the isolation because [J.V.] is getting older and is starting to ask more questions about why he cannot see his family. Father reported that the activities that mother allows [J.V.] to participate

6

in involve mother's constant presence. Father shared that he is concerned about the mental state of [J.V.] and hopes that [[J.V.] can get the help that he needs. [¶] Father stated that mother has had mental health issues for nearly a decade. Father reported the several judges in Family Law court ordered mother to participate in mental health services. Father stated that he believes that mother is refusing to allow [J.V.] to receive mental health services because then mother would begin to lose her control over the minor."

According to the CSW: "Mother and father continue to have a caustic relationship despite the apparent anxiety and depression the minor is experiencing. Despite the detention and placement of the minor, mother continues to deny any mental health issues that she may have or that the minor may have. This fact is concerning with regard to the history that mother presents in only superficially acquiring mental health services for [J.V.]. Additionally, during monitored visitation mother disparages father, the current caregiver, maternal uncle [J.L.] and the maternal grandfather. Mother also—despite repeated attempts at redirection from the CSW and DCFS monitors—continued to tell the minor that at this court hearing the minor will return to her care. This combination of remarks makes the minor visibly upset and causes the mother and minor to argue and become frustrated with one another during the visits. [¶] Mother reports that father is leaving threatening voicemail on . . . mother's home phone. Mother has yet to supply the voicemail and therefore DCFS cannot confirm. Father had stated that he 'will go to the Jim's (caregiver) business and demand to see [J.V.] if visits are not set-up.' These acts continue to frighten the minor and cause [J.V.] to grow only more distant from the father."

In a May 18, 2012, last minute information for the court, a CSW reported that mother initiated individual counseling in April 2012 and had attended four sessions. The CSW further reported that mother had also enrolled at a counseling center and attended eight sessions of parenting classes.

At the May 18, 2012, jurisdiction/disposition hearing, the juvenile court continued the hearing to June 5, 2012. In a June 5, 2012, last minute information for the court, a

7

CSW reported that the minor had been referred to the Department of Mental Health for an assessment and referral to a service provider. An assessment was scheduled for June 7, 2012. As for mother, the CSW reported that mother continued to be enrolled in individual counseling and had completed her parenting course. The CSW also reported that mother visited the minor regularly but at times continued "to respond inappropriately to [J.V.'s] verbal and non-verbal signals as evidenced by mother's refusal to accommodate [J.V.'s] schedule in planning visitation. During visitation mother . . . continued to discuss case issues and continue[d] to disparage the current caregivers." Moreover, based on statements made by mother, the CSW believed that mother might leave the state with J.V.

At the June 5, 2012, jurisdiction/disposition hearing, the juvenile court admitted evidence and heard arguments of counsel, and found the allegations in paragraphs s-1 and s-2 of the section 387 petition true and sustained the petition. As to disposition, the juvenile court found and ruled as follows: "Having found the petition true, I will again declare the minor a dependent under section 300 and find by clear and convincing evidence under [section] 361[, subsection] (c) there's a substantial danger if the child were returned home to the physical health, safety, protection, or physical or emotional well-being of the child, and there's no reasonable means by which the child's physical health can be protected without removing the child from the parents' physical custody. [¶] Order that [J.V.] be removed from the parents with whom the child resided at the time the petition was filed. Reasonable efforts were made to prevent or eliminate the need for removal from the home of the custodial parent. [¶] Suitable placement orders are to continue in full force and effect. Placement with the maternal uncle is approved of at this time. [S]o we'll go ahead and agree to have [J.V.] placed there. The Department will have discretion to place with any appropriate relative. [¶] Case plans will be implemented for both mother and father as provided by County Counsel. Mother is advised that services need to be completed within the 12-month period, or if not, we could terminate reunification services and go to a permanency plan where a plan of adoption, legal guardianship, or long-term foster care could be implemented."

In *In re J.V.* (February 25, 2013, B242145 [nonpub.opn.]), we affirmed, inter alia, the juvenile court's disposition orders removing custody of J.V. from mother, holding that there was substantial evidence that continuing J.V. in mother's custody would be detrimental to J.V.'s emotional well being.

## B.    The Current Appeal

At a walk-on hearing on September 28, 2012, J.V.'s counsel requested that J.V. be enrolled immediately in counseling, and DCFS be admonished to follow court orders that mother and J.V. visit only in a therapeutic environment.  DCFS's counsel advised the juvenile court that it had not yet found a therapist for therapeutic visits between mother and J.V., and the matter was ongoing.  Recently a CSW, who has some therapeutic background, was monitoring the visits at DCFS' offices.  The juvenile court ordered the CSW continue to monitor visits until a therapist was found, J.V. to be enrolled in individual counseling, and set a six-month review hearing for December 4, 2012.

On December 4, 2012, DCFS filed a status review report stating that on November 7, 2012, J.V. began individual counseling.  J.V. had been residing with his maternal uncle for the previous six months.  J.V. is adjusting well in that placement, is comfortable there, and said he enjoyed residing with his maternal uncle and is happy and content.  J.V. was progressively becoming more open, receiving medical examinations, meeting all developmental stages, and participating in numerous extra-curricular and family activities.  He was in the 8th grade, displayed no behavioral problems at school, but was "achieving below grade level."  J.V.'s 7th-grade report card provided that J.V. earned two B's, two D's, and two F's.

The December 4, 2012, status review report stated that mother was in compliance with the juvenile court's orders.  Since April 16, 2012, mother was actively participating in individual counseling, on May 17, 2012, completed parenting classes, and on October 4, 2012, began conjoint counseling with J.V. every other week.

The status review report provided that mother said she did not have mental health issues and is participating in counseling because it was required to have J.V. returned to

her care. According to the status review report, a September 13, 2012, progress letter from mother's therapist stated that mother was punctual and consistent in attending the weekly therapy sessions, and committed to working towards the treatment goals of decreasing her anxiety and depression. Mother seemed sincere and appeared to feel deeply concerned about the well-being of J.V., and willing to take extra measures to ensure J.V.'s safety. Mother said that father was violent and a threat to her, and father continually harassed her with telephone calls. Mother also said that father and the maternal uncle controlled J.V.'s life. A November 19, 2012, progress letter from mother's therapist stated that mother had attended 31 sessions, was consistent and punctual, and seemed sincere, but still believed the maternal uncle and father were controlling J.V.'s life, and said they consistently placed him in dangerous situations.

According to the December 4, 2012, status review report, J.V. said that he would like to return to mother's custody, although not at "this exact time." J.V. said he needed more time to openly express his desires to mother in conjoint counseling regarding contact with the maternal grandparents, maternal uncles, and father, enjoyed visiting his maternal grandfather, and was glad he was getting to know his father again.

The December 4, 2012, status review report stated that on August 28, 2012, mother began monitored visitation with J.V., and during those visits mother "is usually appropriate." Mother would arrive on time, bring food, snacks, drinks, photographs of when J.V. was younger, and activities for J.V. Mother and J.V. both said that they enjoyed the time they spent with each other. The CSW, however, had concerns that "mother continues to be unreasonable, rude and offensive; she uses fear and intimidation and is in need of continued therapeutic services . . . . Mother's exasperated comments during the visitation demonstrate that continued services are needed." The status review report stated that mother tended to get angry, hostile, react inappropriately, and engage in bullying behavior.

According to the December 4, 2012, status review report, during one of mother's visits with J.V, he asked for some Boy Scout items, an IPad, and other items, and mother responded, "Those things will be here for you when you come home." During mother's

10

visits with J.V., mother would get upset when discussing J.V.'s activities at his current placement or visits with his maternal grandfather, believing 13-year-old J.V. might have been in danger. Mother cited as examples J.V. talking about racing bicycles, and having traveled alone on the Metrolink. Mother also said that she saw J.V. using a chainsaw; J.V. denied that he used a chainsaw. When J.V. talked about having fun with other members of the family, such as going to a car or bike show, or other "outings," mother would ignore him, change the subject, make disapproving facial expressions, or "twist" the positive idea and "make it negative," which inhibited J.V. from expressing his true feelings.

The status report stated that during one visit, mother shouted that she would never let J.V. see his grandfather once J.V. returned to her. During other visits, mother accused J.V. of being coached and bribed to say certain things, and became upset and slammed a sheet of paper on the table.

The December 4, 2012, status review report stated that during one visit, mother said to the CSW, "When is this going to stop? You [are] staring in our faces. This isn't very therapeutic." Mother also said to the CSW, "Oh, the court report is going to have stories, just like they always do." During another visit, mother said to the CSW, "You aren't doing anything. You're not even taking care of [J.V.'s] glasses." Once when the CSW interrupted to ask J.V. a question, mother said, "This visit is supposed to be for me!" On another occasion, mother told the CSW, "This is my visit for me and my son," closed the blinds in the room, and said to J.V., "let's just sit."

On December 4, 2012, at mother's request, the juvenile court set a contested six-month review hearing for January 17, 2013. DCFS filed a last minute information for the court in connection with the January 17, 2013 hearing, stating that on December 10, 2012, Pastor Laurel Peterson began monitoring mother's visits with J.V. Pastor Peterson observed that mother brought meals and activities for J.V., but also saw mother's anger toward the CSW and maternal uncle. Pastor Peterson said that when mother's anger was mentioned, mother "put me on the enemy side. But now she is okay with me." According to the last minute information for the court, on December 21, 2012, after

11

mother and the CSW discussed the vacation and visitation schedule, mother made "childish whining noises" and accused CSW of "writing lies" about her in reports.

In a January 3, 2013, progress letter, mother's therapist stated that mother had attended a total of 34 sessions, was consistent and punctual in attending her sessions, and was cooperative, committed, and willing to take extra measures to ensure J.V.'s safety. The therapist indicated mother believes father and the maternal uncle were controlling J.V.'s life, and were consistently placing J.V. in dangerous situations, such as allowing J.V. to use a chainsaw without protective gear. Mother reported that J.V. was failing in many of his school classes. Mother also said father continued to harass her with telephone calls, and thought J.V. was being forced to see father.

The CSW reported that on January 7, 2013, she arrived with J.V. 15 minutes late for mother's monitored visit with him. In response, mother slammed the visitation room door, refused to let the social worker enter, and yelled, "I am not going to play these games with you!" There was no cellular telephone service at the site, and mother insisted that she rather than the CSW use the telephone at the site to call Pastor Peterson. Mother continued arguing, and slammed the door a second time. Once Pastor Peterson arrived at the site, mother yelled "Come with me now, J.V.!" then yelled at the CSW, "I am going to deal with you in court!"

On January 17, 2013, the juvenile court held the section 366.21, subdivision (e) hearing, and admitted documentary evidence. Pastor Peterson testified that mother and J.V. got along "very good" at visits, and had a lot of positive interaction. He said that mother had never done or said anything that caused him concern throughout the three years he had known her, and did not seem to be "a risk."

Pastor Peterson testified that during one visit, he witnessed mother display anger toward the CSW, and during another visit she displayed anger toward the maternal uncle. Pastor Peterson testified mother did not feel the maternal uncle supported her, on one occasion mother "got a little bit mad" at Pastor Peterson when he suggested she "hold back on her anger." And, although Pastor Peterson never heard mother and J.V. talking

12

about father, he heard mother say "some things about the father," which had "not been positive."

The parties stipulated that if J.V. were called to testify, he would say he enjoyed visiting father, wanted to go home to mother immediately, and denied saying that he did not want to return to mother.

The juvenile court stated that it was concerned mother was "setting up an us versus them type of mentality." The juvenile court said, "I'm really not getting a good sense, because even during monitored visits with someone that she knows and likes, she turns on them in a heartbeat. And she already has set up a very poisonous atmosphere between her and the [CSW]. [¶] . . . [¶] . . . When you read these documents today, it would seem there's not a, quote, unquote, current risk of harm or detriment. . . . [But,] unless and until I'm satisfied that mother is willing to go along with the program, I have very deep concerns about returning [J.V.] home even if he wants to go home."

J.V.'s counsel stated that J.V. wanted to be returned to mother's custody but it was premature to do so. J.V.'s counsel said that he was concerned that mother was alienating J.V. from father. J.V.'s counsel also stated that previously, J.V. was "absolutely terrified" of father, but now enjoyed visiting him; J.V. is also no longer afraid of maternal uncle and maternal grandfather; and "there are still red flags in the reports."

The juvenile court found that mother was in partial compliance with her case plan, stated that failure to make substantive progress in court ordered treatment was prima facie evidence that return would be detrimental, and said, "That's really what the court is finding today." The juvenile court stated that "I realize the mother has more recently been in compliance. The demonstrated conduct of the mother towards all of the parties involved with the child . . . has not demonstrated to this court that the mother is actually internalizing the lessons that are supposed to be learned through these classes and programs."

The juvenile court found that returning J.V. to mother's custody would create a substantial risk of detriment to the child, ordered J.V. to remain suitably placed, and continued reunification services for mother. The juvenile court granted mother

13

monitored visits, three times per week.  The juvenile court indicated that if there were no incidents at or during the visits for three weeks, then mother could have unmonitored visits three times per week at the maternal uncle's home, as long as the maternal uncle was present in the home.

The court found a substantial probability that J.V. would be returned to mother's custody by the 12-month review hearing, and set a 12-month review hearing for July 18, 2013.  The trial court said to mother, "I've set up a pathway to success for you.  All you have to do is follow it.  . . . You need to listen to what I'm telling you and go along with the program."

## DISCUSSION

Mother contends substantial evidence does not support the finding under section 366.21, subdivision (e) that returning J.V. to her custody created a substantial risk of detriment to the child.  We disagree.

### 1. Standard of Review

We review findings and orders made pursuant to section 366.21 for substantial evidence.  (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 183; *James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.)  In determining whether an order is supported by substantial evidence, "we look to see if substantial evidence, contradicted or uncontradicted, supports [it].  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.  [Citation.]"  (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.)  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."  (*In re Matthew S*. (1988) 201 Cal.App.3d 315, 321.)  Thus, the pertinent inquiry is whether substantial evidence

14

supports the finding, not whether a contrary finding might have been made. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228.)

        *2.    Analysis*

Section 366.21, subdivision (e) provides in part, "At the review hearing held six months after the initial dispositional hearing, but no later than 12 months after the date the child entered foster care as determined in Section 361.49, whichever occurs earlier, after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

Substantial evidence supports the finding that the return of custody to mother at the time of the hearing would create a substantial risk of detriment. The evidence that supports the trial court's finding is as follows. On June 5, 2012, J.V. was removed from mother's custody because of mother's mental and emotional problems, as well as her emotional abuse of J.V. which included continued disparagement of and emotional isolation from father and other relatives. Although mother had completed her parenting course and was attending her individual counseling sessions, by the January 17, 2013, six-month review hearing, mother was still engaging in emotionally abusive behavior, and displaying mental and emotional problems.

There was evidence that mother said things about father that had "not been positive." Mother claimed J.V. was being forced to see father, and was being "coached" and "bribed" to say positive things about him. Mother also felt the maternal uncle did not "support" her. Mother was visibly angry at the maternal uncle, and mother became angry with Pastor Peterson and put him "on the enemy side" when he told her to "hold back" her anger.

There was evidence that during visits, mother would get upset when J.V. discussed engaging in activities with father and the maternal grandfather. When J.V. talked about doing something that he liked with other family members, such as going to a bike or car show, mother ignored J.V., made disapproving facial expressions, changed the subject, or "twist[ed] the positive idea and [made] it negative," which inhibited the child from expressing his true feelings. During one visit, mother shouted that she would never let J.V. see his grandfather once he returned to her custody.

There was also evidence for which the juvenile court described as mother establishing "a very poisonous atmosphere between her and the [CSW]." Mother accused the CSW of "writing lies" in the court reports. On one occasion, when the CSW interrupted the visit to ask J.V. a question, mother said, "This visit is supposed to be for me!" On another occasion, mother told the CSW, "This is my visit for me and my son," closed the blinds in the room, and said to J.V., "let's just sit." In January 2013, after the CSW arrived 15 minutes late with J.V. to a visit, mother slammed the visitation room door, refused to let the CSW in, yelled, "I am not going to play these games with you!" and slammed the door. She would not allow the CSW to use the telephone. Mother had not succeeded in working her way up to unmonitored visits.

There is sufficient evidence that return of J.V. to mother's custody would create "a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child[.]" (§ 366.21, subd. (e).) Mother essentially reargues the evidence, pointing to contrary evidence, and asks us to reweigh it. Although there might be conflicting evidence, as long as there is substantial evidence to support the juvenile court's findings, we must affirm. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        MOSK, Acting P. J.


We concur:


        KRIEGLER, J.


        KUMAR, J.[*]


---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.